UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                    Plaintiff

v.                                                    Criminal Action No. 3:18-cr-00059-RGJ

CHESTER THORN                                                              Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Chester Thorn's Motion to Suppress Any and All Evidence Seized at the Time of His Arrest. [DE 23]. The Court held a suppression hearing on February 13, 2019. [DE 29]. Briefing is complete, and the Motion is ripe. [*See* DE 26; DE 36; DE 37]. For the reasons below, the Court **DENIES** Thorn's Motion.

## BACKGROUND

On March 14, 2017, Louisville Metro Police Department ("LMPD") Detectives Brad Jones and Joseff Keeling spoke with an individual who complained of drug trafficking at a "drug house" in Louisville. [DE 29, Tr. Supp. Hearing at 107:17–25, 108:1–15]. The complainant admitted that he had previously purchased marijuana from the alleged trafficker but now wanted the drug house to be "shut down." [*Id.*].

Acting on the complaint, Detectives Jones and Keeling drove by the alleged drug house to examine the situation. The detectives witnessed an individual carrying a bag leave the house and get in the passenger seat of a white Lexus that was parked in the driveway. [*Id.* at 114:13–25, 115:1–4]. Several minutes later, the individual exited the Lexus without the bag and reentered the house. [*Id.*]. Detective Jones suspected that the activity "could have been some form of payment,

1

some kind of drug transaction activity which, you know, led us to believe the credibility of the complainant that came in and talked to me." [*Id.* at 115:8–11].

When the Lexus left the house, the detectives followed the vehicle and contacted an LMPD K-9 unit while they drove on the Snyder Expressway. [*Id.* at 126:24–25]. Before the K-9 unit arrived, the Lexus swerved abruptly into the left-turn lane without using a turn signal. Detective Jones stopped the Lexus upon seeing the traffic violation. [*Id.* at 116:4–10].

Detective Jones approached the Lexus, introduced himself, and explained to the driver, Thorn, why he pulled him over.[1] Detective Jones asked Thorn for his name and requested his license, registration, and proof of insurance. Detective Jones, looking at the license, asked Thorn if he still lived on Monaco Drive, and Thorn replied "yeah . . . , well that's my address, . . . yeah, that'll work." Detective Jones sought to clarify, and Thorn responded that he was "stay[ing] with a friend right now." Detective Jones again tried to clarify, and Thorn eventually provided an address on Wabash Place.

Detective Jones instructed Thorn to step out of the vehicle and provide proof of insurance, which Thorn said was on his phone. Detective Jones asked Thorn if there were any drugs or weapons in the car. Thorn said no, and Detective Jones asked Thorn if he could look in the car. Thorn declined. Thorn exited the vehicle, pulled up the proof of insurance on his phone, and handed the phone to Detective Jones. Detective Jones examined the insurance information on Thorn's phone, after which Detective Keeling verified the vehicle's VIN number to confirm that it was the same vehicle listed on the insurance. [*Id.* at 119:14–15].

Detective Jones went to his vehicle to conduct a routine background check and write a citation for the traffic violations, while Detective Keeling stood outside the police truck with

---

[1] Unless otherwise noted, these events were captured by Detective Jones's body camera. [*See* DE 33, Supp. Hearing U.S. Ex. 2].

2

Thorn. Unlike LMPD's marked vehicles, which are equipped with a mounted computer terminal, printer, and scanner to input driver's license information and print out a citation, the unmarked police truck that Detective Jones was driving relied on a separate computer that the detectives carried in the back seat. [DE 36 at 208–09]. Detective Jones retrieved the computer and logged in to conduct the background check. The computer had trouble connecting to the network, and Detective Jones became visibly frustrated with the delay in obtaining information. Detective Jones explained the delay to Thorn and ultimately exited and logged back into the program, eventually finding the information he sought. [DE 29, Tr. Supp. Hearing at 124–25].

After reviewing the information from the online database, Detective Jones began filling out a citation for two traffic offenses—improper lane changing and failure to notify the Department of Transportation of a change of address. [*Id.* at 126:8–9]. While Detective Jones wrote out the citations, the K-9 officer arrived. The K-9 performed a "sniff" around the Lexus and tried to enter the passenger's side through the window. The K-9 officer told Detective Keeling that the K-9 confirmed a hit on the vehicle for the presence of contraband. [*Id.* at 167:13–23]. After the hit, Detective Keeling and the K-9 officer searched Thorn's car. Thorn became angry and attempted to grab his phone. Detective Keeling handcuffed Thorn to prevent him from destroying evidence on the phone, which had been "constantly going off" during the stop. [*Id.* at 168:16–25, 169:1–17]. The detectives searched Thorn's Lexus and found a loaded pistol in the center console, approximately $40,000 in cash in a leather bag on the passenger-side floorboard, and approximately twelve pounds of marijuana in a plastic tote in the trunk.

A grand jury charged Thorn with drug and firearm offenses. [DE 1]. Thorn now moves to suppress evidence discovered during the stop and search of his vehicle. [DE 23]. The Court held a suppression hearing [DE 29], and the parties filed post-hearing briefs [DE 36; DE 37].

**DISCUSSION**

Thorn argues that the stop was improper because the police had no arrest or search warrant, saw no misdemeanor or felony committed in their presence, and did not have probable cause to believe that a felony was committed in their presence. [DE 23 at 54]. Thorn also argues that even if the stop were supported by probable cause, the stop was unreasonably extended. [*Id.* at 55–56]. Finally, Thorn asserts that the "officer learned nothing during the legitimate stop that rose to the level of reasonable suspicion justifying further investigation of a different crime." [*Id.* at 56]. For these reasons, Thorn seeks to suppress the items found in the car.

**A.     The Stop of Thorn's Vehicle was Proper.**

First, Thorn alleges that his vehicle was improperly stopped. [DE 23 at 54]. Police officers can lawfully stop a vehicle when they have probable cause that the driver committed a traffic violation. *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). And a stop based on a traffic violation is permissible even if it is used as pretext for further investigation. *Whren v. United States*, 517 U.S. 806, 813 (1996). Indeed, an officer's actual motivation for making the stop is irrelevant to the constitutionality of the stop when the officer has the requisite probable cause to make the stop. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). In other words, if a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." *Ferguson*, 8 F.3d at 391.

Here, Detectives Jones and Keeling saw Thorn's car "veer across two traffic lanes and turn without signaling." [DE 36 at 211]. Changing lanes without signaling violates Kentucky law. *See* Ky. Rev. Stat. § 189.380. The detectives thus had probable cause to stop Thorn. The detectives' prior investigation into the reported drug house does not affect the constitutionality of the stop, even if the stop were pretextual to further investigate that report. *Whren*, 517 U.S. at 813.

**B.     The K-9 Sniff Did Not Violate the Fourth Amendment.**

Next, Thorn alleges that even if the officers had probable cause for the stop, the stop was improperly extended. [DE 23 at 55–56]. Traffic stops cannot be "excessively intrusive and must be reasonably related in time to the investigation." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). A traffic stop justified only by the interest in issuing a citation becomes unlawful if the stop is "prolonged beyond the time reasonable required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). But the stop may be extended if "something [] occurred during the traffic stop [that] generated the necessary reasonable suspicion to justify a further detention." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008).

Relying on *Rodriguez v. United States*, Thorn notes that traffic stops are "relatively brief encounter[s]" that allow for "ordinary inquiries incident to [the traffic] stop." 135 S. Ct. 1609, 1614–15 (2015) (internal quotation marks and citations omitted). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

Thorn asserts that this case is analogous to *Rodriguez*. [DE 26-2 at 98]. In that case, the officer pulled over the defendant to conduct a traffic stop. 135 S. Ct. at 1612. After the officer issued a warning ticket and returned the defendant's documents, the officer asked if he could walk his K-9 around the vehicle. *Id.* at 1613. Despite the defendant's refusal, the officer did so. *Id.* The K-9 alerted, and the officer found a bag of narcotics in the vehicle. *Id.* On appeal, the Supreme Court held that the officer's extension of the traffic stop without reasonable suspicion to conduct a dog sniff violated the Fourth Amendment's protection against unreasonable searches and seizures. *Id.* at 1611.

While this case, like *Rodriguez*, concerns a dog sniff during a traffic stop, the facts are much like those in *Caballes*, a case relied upon by the Court in *Rodriguez*. In *Caballes*, the defendant was pulled over for speeding. 543 U.S. at 406. The responding officer radioed police dispatch to report the stop, and an officer with a narcotics-detection dog overhead the transmission and headed to the scene. *Id.* When the second officer arrived, the responding officer was in the process of writing a ticket for the defendant, and the second officer walked his dog around the car. *Id.* The dog alerted on the trunk, in which the officers found narcotics. *Id.*

On appeal, the Court noted that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407. The Court accepted the state court's conclusion that the stop's duration was justified "by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at 408. And it clarified that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy." *Id.* *Rodriguez* affirmed these principles, noting that "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 135 S. Ct. at 1611. "Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Once this mission is complete, the officers must release the suspect absent reasonable suspicion. *Id.* at 1615.

In this case, Detective Jones collected the necessary documents to perform the routine background check before writing the citation. [DE 29, Tr. Supp. Hearing at 118–19]. While

6

Detective Jones performed these checks and wrote the citation, the K-9 sniffed the vehicle. [*Id.* at 127]. The dog alerted on the front passenger side door, and the detectives searched the car and found the relevant evidence. [DE 23-1]. The stop was not prolonged to complete the sniff. As in *Caballes*, and unlike in *Rodriguez*, the K-9 sniffed the vehicle while the detective was writing the citation. [DE 29 at 128:6–10]. Indeed, Detective Jones had not even finished writing the citation when the K-9 alerted on the vehicle. [*Id.*]. The detectives thus did not extend the traffic stop beyond what was required to complete the stop's mission, and the United States was therefore not required to show reasonable suspicion for the K-9 sniff. For these reasons, the K-9 sniff did not violate the Fourth Amendment.

## CONCLUSION

For the reasons set forth above, and being otherwise sufficiently advised, **THE COURT HEREBY ORDERS** that Thorn's Motion to Suppress [DE 23] is **DENIED**.

Cc: Counsel of record